IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 16, 2003

## STATE OF TENNESSEE v. ERIC T. ARMSTRONG

**Direct Appeal from the Circuit Court for Williamson County**
**No. I-901-265      Donald P. Harris, Judge**

_____

**No. M2003-00762-CCA-R3-CD - Filed June 2, 2004**

_____

The appellant, Eric T. Armstrong, was convicted by a jury in the Williamson County Circuit Court of aggravated robbery and especially aggravated kidnapping. Following a hearing, the trial court sentenced the appellant to an effective sixteen year sentence in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence, the denial of the motion to suppress Lara Carter's identification of the appellant, the constitutionality of the jury venire, and his conviction of especially aggravated kidnapping under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Stacey M. Brackeen, Franklin, Tennessee (on appeal), and Mark L. Puryear, III, Franklin, Tennessee (at trial), for the appellant, Eric T. Armstrong.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Derek K. Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

At 9:56 p.m. on January 25, 2001, Assistant Manager Lara Carter was preparing to close the Burger King restaurant on Franklin Road in Brentwood when she heard one of her co-workers exclaim, "Oh my God, we're being robbed." There were no patrons in the restaurant. Carter turned and observed two large African-American men with weapons coming toward the kitchen. The smaller man, later identified as the appellant, had a silver-plated pistol and "corralled" Carter's three

co-workers, Ahmed Sindi, Mahir Sindi, and Julian Velazquez, into the kitchen.[1] The larger man, later identified as Olean Thompson, approached Carter with a shotgun, forced her into the manager's office, and ordered her to remove the money from the safe. He then ordered her to empty the money from the cash register tills and the "dropboxes" underneath the cash registers. Thereafter, Thompson led Carter back to the office.

In the office, Thompson put down his shotgun and counted the money, which Carter estimated to be $3,000. When he finished counting the money, Thompson leaned over the desk, "jerked" the telephone cord from the wall, and put the cord into his pocket. Carter observed her co-workers sitting on the floor in the kitchen with their wrists and ankles bound with duct tape. The appellant stood over them, holding his pistol. They appeared upset and frightened.

Carter became frightened and started to cry. She begged Thompson not to kill her. Thompson replied, "I'm not here to kill you. I only want the money." He ordered Carter to sit by her co-workers. He then ordered the appellant to bind Carter's wrists and ankles, and the appellant complied after placing his pistol on the "prep table." Carter testified that as the appellant bound her wrists and ankles, she looked intently at his face. She observed that the appellant had beady, brown, "sluggish, puppy dog . . . eyes," and a flattened nose with flaring nostrils.

Thompson returned to the office and placed the money into two bags. The appellant asked which bag was his, and Thompson handed the appellant a bag of money. The two men then proceeded to the front of the restaurant. As they reached the front counter, they stopped and turned to face the victims. Carter believed the men were going to kill her and her co-workers. Instead, Thompson said, "Don't worry, you're not going to sit on the floor long because I'm gonna call the police and let them know you're here." The men then left the restaurant.

After the men had left, Carter chewed the duct tape from her wrists and removed a portion of the tape from her ankles. She ran into the office and plugged the cord from the computer modem into the telephone. She then called 911 and reported the robbery. Upon returning to the kitchen, Carter removed the duct tape from Ahmed's wrists, and Ahmed removed the tape from Mahir and Velazquez's wrists. The Brentwood Police Department arrived within minutes.

At trial, Carter testified that she was bound for approximately six minutes, but her co-workers were bound for a longer period of time. She related that the Burger King was not equipped with a video camera. However, she was able to see the perpetrators because the restaurant was well-lit and the perpetrators were present for approximately fifteen minutes.

Carter testified that she recognized the larger man, although she was unable to remember his name. She explained that she had recently accepted an employment application from him. From this application, she learned that his name was Olean Thompson. Carter testified that she had previously

---

[1] Because two witnesses are brothers and share the last name "Sindi," we have elected to utilize their first names for the purpose of brevity. We intend no disrespect to these individuals.

employed Thompson's father and sister, whom Thompson visited at the Burger King. Moreover, Carter worked with Thompson one evening when she substituted for another manager at the Burger King restaurant in Old Hickory.

Carter also recognized the man with Thompson. He was wearing blue jeans, tennis shoes, gloves, a cap, and a long, black leather jacket. Carter related that, although he was smaller than Thompson, he was nevertheless a large man. Carter estimated that he was six feet tall and three hundred fifty pounds. He wore a blue bandana over his face, but the bandana covered only his lips. Carter was able to see from his nose to a portion of his hair that was not under his cap. She testified that he had unique facial features, namely "little brown eyes, kind of sluggish looking, like a little puppy dog's eyes, like he was sleepy." He had a flat-bridged nose with flaring nostrils, very dark skin, a "puffy" face, and black hair.

Initially, Carter believed that the man was Thompson's brother because she had previously seen him when he accompanied Thompson to Burger King to visit Thompson's father and sister. Carter subsequently recalled that Thompson's brother had been working the night she substituted at the Burger King in Old Hickory. After contacting the human resource manager at the Burger King Corporate Office, Carter provided Detective Wood with the name of Thompson's brother, Antonio Thompson.

Approximately two weeks after the robbery, Detective Wood showed Carter a photographic lineup, which lineup included a photograph of Antonio Thompson. Carter was unable to identify a suspect in the lineup. Months later, she was shown a second photographic lineup. Within two seconds, she identified the appellant in photograph number two. Carter related at trial that she had been "100 percent certain" that the appellant was the man who robbed the Burger King with Olean Thompson. Prior to trial, she observed the appellant in the courthouse and thought, "There goes the man that robbed me."

On cross-examination, Carter acknowledged that she did not learn the appellant's name until he was arrested. She conceded that initially she informed Detective Wood that the second robber was Antonio Thompson. However, she explained that she believed the appellant was Thompson's brother because she had seen him with Thompson on several occasions, and Thompson's sister had told her that she had "brothers." Carter admitted that she had previously given three different descriptions of the appellant's bandana, but explained that she was looking at his face, not his bandana.

Carter conceded that on the night of the robbery, she informed the officers that the appellant had "black, tall Afro-type hair [sticking from underneath] his cap." She further agreed that in the second photographic lineup, the appellant was the only suspect with Afro-type hair. However, Carter stated that, although the hair was significant, she could have identified the appellant by his eyes and nose. She explained that the appellant was "in her face" as he bound her wrists and ankles.

Ahmed Sindi testified at trial that at approximately 9:45 p.m. on January 25, 2001, he was working at Burger King when he observed Thompson and the appellant enter the restaurant. Thompson had a shotgun and the appellant had a handgun. Ahmed shouted to Carter that they were being robbed. Thereafter, Thompson led Carter into the office, while the appellant ordered Velazquez to tape Ahmed and Mahir's wrists and ankles. Mahir, who had injured his finger attempting to escape, was crying, but when Ahmed attempted to console his brother, the appellant told him to "shut up." After Velazquez taped Ahmed and Mahir, the appellant put down his pistol and taped Velazquez's wrists and ankles. When Thompson brought Carter into the kitchen, the appellant taped her wrists and ankles. On cross-examination, Ahmed was unable to recall whether he had been asked to identify Thompson or the appellant.

Mahir Sindi testified that he was the first employee to see Thompson and the appellant enter the Burger King and that they told him to "hush." Mahir related that he attempted to run, but the men pointed their weapons at him, causing him to fall and injure his finger. While Thompson led Carter into the office, the appellant remained with Ahmed, Mahir, and Velazquez and ordered Velazquez to bind Ahmed and Mahir's wrist and ankles with duct tape. Thereafter, the appellant taped Velazquez's wrists and ankles, and after Carter gave Thompson the money, the appellant bound her in the same manner. Mahir testified that he did not know either of the men, but he believed the men were going to kill them. On cross-examination, Mahir stated that he was not asked by police to identify the appellant.

Julian Velazquez testified through an interpreter that on January 25, 2001, he was employed at Burger King. That evening, he was washing dishes in the kitchen when his co-workers, Ahmed and Mahir, entered the kitchen. Velazquez stated that initially he believed that the brothers were "kidding around," but he quickly realized they were scared. He then observed two men with weapons enter the kitchen. Although Velazquez was unable to understand what the two men were saying, he knew that he was being ordered to raise his hands and "not do anything else." The men forced Velazquez to bind his co-workers' wrists and ankles with tape. The men then bound Velazquez. On cross-examination, Velazquez conceded that he had not been asked to identify the robbery suspects.

Brentwood Police Detective John Wood testified at trial that on January 25, 2001, he was called to the scene of a robbery at the Burger King restaurant on Franklin Road. When he arrived at the scene, he observed that patrol officers were already there, as well as an emergency medical services unit. The patrol officers advised Detective Wood that two African-American men had "held up" the restaurant and bound the employees with duct tape. The officers were unable to lift any fingerprints, but subsequently learned that the perpetrators wore gloves. Detective Wood noted that the restaurant was not equipped with a video camera.

Detective Wood testified that he instructed another officer to have the victims of the robbery complete offense reports while he concentrated on preserving the crime scene. Detective Wood discovered several pieces of duct tape and shoe prints. He then briefly interviewed Carter and obtained a description of the suspects. He related that Carter described one of the suspects as "the

taller one," estimating that he was six feet four inches tall and weighed approximately two hundred fifty pounds. She stated that he wore blue jeans, tennis shoes, a black coat, and a stocking hat. He also wore a bandana across his face. Carter told Detective Wood that "the shorter one" was dressed similarly to the first suspect and was approximately six feet tall and three hundred pounds.

Shortly thereafter, Carter provided Detective Wood with the name of the "taller" suspect, Olean Thompson. The next day, Carter contacted Detective Wood and told him that she believed the second suspect was Thompson's brother, Antonio. She had learned his name by contacting an employee of the Southdown Corporation, which owns and manages Burger King franchises in middle Tennessee. Based upon that information, Detective Wood obtained an arrest warrant for Antonio Thompson, who was arrested four days later. Antonio Thompson was taken to the police department and questioned by Detective Wood and the arresting officer. Within ten minutes, Detective Wood realized that Antonio had not been involved in the robbery. Nevertheless, in order to confirm that Antonio was not involved, Detective Wood prepared a photographic lineup which included Antonio's photograph. Detective Wood presented this lineup to Carter, instructing her that the suspect may or may not be in the lineup. Carter was unable to identify a suspect, and Antonio was released from custody.

Detective Wood testified that the appellant subsequently became a suspect. However, he was not arrested for approximately seven months. After the appellant was arrested, Detective Wood prepared another photographic lineup which included the appellant's photograph. After viewing this lineup, Carter identified the appellant. Detective Wood testified that because the four victims' descriptions of the appellant had been consistent and Carter made the best witness, he did not show the second photographic lineup to the other victims.

On cross-examination, Detective Wood stated that on the night of the robbery, Carter did not inform him that the appellant had an "Afro," but she included that detail in her offense report. He admitted that Carter was inconsistent in her descriptions of the appellant's weight. Detective Wood further conceded that despite being trained to select photographs of individuals who appear similar to the suspect, none of the individuals in the appellant's lineup had hair as long as the appellant's. However, Detective Wood stated that he was not concentrating on the hair. Moreover, he found Carter's description of the suspect to be consistent with the appellant.

Based upon the foregoing testimony, the jury convicted the appellant of one count of aggravated robbery, one count of theft of property over $1,000, and four counts of especially aggravated kidnapping. The trial court merged the theft of property conviction into the aggravated robbery conviction. Following a hearing, the trial court sentenced the appellant to eight years incarceration for the aggravated robbery conviction and sixteen years incarceration for each of the especially aggravated kidnapping convictions, to be served concurrently. At the hearing on the motion for new trial, the trial court dismissed the especially aggravated kidnapping convictions as to victims Mahir Sindi, Ahmed Sindi, and Julian Velazquez, finding that the kidnappings were

incidental to the robbery.[2]  The appellant now appeals, challenging the sufficiency of the evidence, the denial of the motion to suppress Carter's identification of the appellant, the constitutionality of the jury venire, and his conviction of especially aggravated kidnapping under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991).

## II.  Analysis

### A.  Sufficiency of the Evidence

On appeal, the appellant contends that the evidence was insufficient to sustain his convictions.  Specifically, the appellant argues that there was no credible evidence that he was the second individual involved in the robbery.  He asserts that in addition to being the only victim to identify the appellant, Carter gave varying descriptions of the appellant and testified that she was confused.  The appellant further asserts that the day after the robbery, Carter informed Detective Wood that the second robber was Olean Thompson's brother, Antonio.  The appellant argues that "[i]t was not until months later that Ms. Carter identified the [appellant] in a photo lineup . . . [which] lineup was suggestive . . . ."

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).  On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence.  Id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated robbery is defined in pertinent part as robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon."  Tenn. Code Ann. § 39-13-402(a)(1) (2003).  Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a) (2003).  Especially aggravated kidnapping is committed when, by

---

[2]Because the State did not challenge the appropriateness of the trial court's dismissal of the convictions for the especially aggravated kidnappings of Mahir Sindi, Ahmed Sindi, and Julian Velazquez, we will not address the issue on appeal.  Moreover, because we have concluded that the convictions for aggravated robbery and the especially aggravated kidnapping of Carter should be affirmed, we have not addressed the appropriateness of the trial court's "merger" of the Class A felony convictions of especially aggravated kidnapping into the Class B felony conviction of aggravated robbery.

use of a deadly weapon, an accused knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty. Tenn. Code Ann. §§ 39-13-302(a), -305(a)(1) (2003).

In the instant case, the appellant's sufficiency claim is based upon Carter's identification of the appellant. This court has previously held that the testimony of a victim identifying the perpetrator is sufficient to support a conviction. State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993). "Inconsistency, inaccuracy and omissions in the description of a defendant by a witness who is otherwise able to positively identify the defendant are questions for the jury to consider in determining the weight to be given the testimony." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). The jury's verdict will not be disturbed on appeal unless the inaccuracies, inconsistencies, or omissions are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt. Id.

Our review of the record reveals that Carter's testimony was not so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt. Carter testified that the Burger King was well-lit and she was able to intently observe the appellant's face as he bound her wrists and ankles. Thereafter, she provided Detective Wood with an accurate, detailed description of the appellant, noting the appellant's unique facial features including his "sluggish, puppy dog . . . eyes." Because Carter had observed the appellant with Thompson on prior occasions, she initially believed that he was Thompson's brother. However, when asked to view a photographic lineup containing a photograph of Antonio Thompson, Carter was unable to identify a suspect. Moreover, although Carter viewed the second photographic lineup approximately seven months after the robbery, she identified the appellant within seconds and claimed that she was "100 percent certain" that he was the individual who entered the restaurant with Thompson, held her co-workers at gunpoint, bound her wrists and ankles, and shared in the money taken by Thompson. Accordingly, we conclude that the evidence supports the jury's verdicts.

## B. Motion to Suppress Identification

Next, the appellant contends that the trial court erred by denying his motion to suppress Carter's identification of the appellant. Specifically, the appellant asserts that the identification was unreliable because Carter did not identify the appellant in the photographic lineup until seven months after the robbery. The appellant further asserts that he was the only individual in the lineup with "Afro-type" hair. The appellant argues that "any and all identifications by Carter were tainted by the suggestive nature of the lineup and should have been suppressed." The State maintains that the trial court properly denied the appellant's motion to suppress the identification.

The trial court's findings of fact in a suppression hearing will be upheld on appeal unless the evidence preponderates against those findings. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in

the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

Id. However, the application of the law to the trial court's findings of fact is a question of law subject to de novo review. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Neil v. Biggers, 409 U.S. 188, 198-99, 93 S. Ct. 375, 381-82 (1972), the United States Supreme Court established a two-part analysis to assess the validity of a pre-trial identification. First, the trial court must determine whether the identification procedure was unduly suggestive. Biggers, 409 U.S. at 198, 93 S. Ct. at 381-82. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." State v. Cribbs, 967 S.W.2d 773, 794 (Tenn. 1998) (citing Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967 (1968)). If the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Biggers, 409 U.S. at 198-99, 93 S. Ct. at 382.

In its order denying the appellant's motion to suppress the photographic identification, the trial court agreed that "the array [was] somewhat suggestive," but determined that

it [was] not, in the opinion of the court, so distinctive or suggestive as to create a substantial likelihood of misidentification under the circumstances of this case. Ms. Carter recognized the person committing the robbery as someone she had previously seen and related that fact to the investigating officers prior to her identification even though she mistakenly described the person as being Olean Thompson's brother. The hair on the person robbing Ms. Carter was largely covered by a stocking cap with only some hair in the front showing so that Ms. Carter could only guess how it would appear without the cap. While the [appellant's] hair in the photograph included in the array [was] longer than the other persons pictured, the six photographs in the array are substantially similar to one another so that the length of the [appellant's] hair when compared to the other persons depicted does not make the array unreasonably suggestive.

As previously noted, the appellant asserts that because the photographic lineup was unduly suggestive and the identification process was unreliable, the trial court erred by denying his motion to suppress Carter's identification of the appellant. However, the appellant failed to include a transcript of the suppression hearing in the record on appeal. It is the appellant's duty to "have

prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). Without a proper record for our review, we must presume that the findings of the trial court are correct. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Regardless, the issue is without merit.

After examining the photographic lineup which was entered into evidence, we agree with the trial court that because the appellant was the only individual with "Afro-style" hair, the photographic lineup was "somewhat suggestive." However, as noted, a pretrial identification procedure, even if suggestive, will not negate the identification of the appellant when it is otherwise reliable. Biggers, 409 U.S. at 198-99, 93 S. Ct. at 382; Cribbs, 967 S.W.2d at 794. In Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382, the Supreme Court identified five factors for assessing the reliability of an identification: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. See also State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994).

After considering these factors, we conclude that the identification procedure in the instant case was reliable. Carter had ample opportunity to view the appellant during the robbery. At trial, Carter testified that the Burger King was well-lit and the robbers were present for approximately fifteen minutes. Carter observed the appellant as he held her co-workers at gunpoint and when he questioned Thompson about his share of the money. Moreover, she testified that she looked intently at the appellant's face as he bound her wrists and ankles with duct tape.

Carter's degree of attention was evidence by the detailed description she provided to Detective Wood, describing the appellant's beady, brown, "sluggish, puppy dog . . . eyes," flattened nose with flaring nostrils, dark skin, "puffy" face, and "Afro-type" hair. Detective Wood testified at trial that Carter's description of the appellant was consistent with that of the other victims. Carter also expressed a high level of certainty when she viewed the appellant's photograph in the second lineup, identifying the appellant within a matter of seconds and stating that she was "100 percent certain." After viewing the appellant's photograph in the lineup, we find the description to be accurate.

Generally, the fact that Carter did not identify the appellant until nearly seven months after the robbery would weigh against the admissibility of the identification. See Biggers, 409 U.S. at 201, 93 S. Ct. at 383. However, in the instant case, this factor does not negate Carter's reliability because she had not previously identified another suspect despite being asked to view another lineup. Id. Based upon the totality of the circumstances, we conclude that the identification was reliable. Accordingly, the trial court did not err by denying the appellant's motion to suppress Carter's identification testimony.

## C.  Jury Venire

Next, the appellant contends that because there were no African-Americans or minorities on the jury venire, the venire did not represent a fair cross-section of the community.  The State maintains that the appellant failed to establish a prima facie violation of his right to have a jury selected from a representative cross-section of the community.  We agree with the State.

Prior to the swearing of the jury, the appellant, who is African-American, objected to the venire from which his jury was selected, arguing that because there were no African-Americans or minorities on the venire, the venire did not represent a fair cross-section of the community.  The trial court stated that there were African-Americans on the jury venire.  The trial court explained that the Williamson County Criminal Court had summoned eight panels of jurors "for th[at] period of time" because a capital murder case was set for trial.  The trial court stated that two of the panels had at least one African-American, and three other panels had four African-Americans.  According to the trial court, it was a "result of chance" that no African-Americans appeared on the panel from which the appellant's jury was selected.  The trial court noted that Williamson County's population was less than five percent African-American.  The trial court overruled the appellant's objection.

The Sixth Amendment guarantees a criminal defendant the right to a petit jury selected from a representative cross-section of the community.  Taylor v. Louisiana, 419 U.S. 522, 530, 95 S. Ct. 692, 697-98 (1975); State v. Bell, 745 S.W.2d 858, 860 (Tenn. 1988).  In Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979), the United States Supreme Court set forth a three-pronged test for determining whether a jury was properly selected from a fair cross-section of the community.  To establish a prima facie violation of the fair cross-section requirement, the appellant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.  Duren, 439 U.S. at 363, 99 S. Ct. at 668; State v. Buck, 670 S.W.2d 600, 610 (Tenn. 1984).

Clearly, the African-American population of Williamson County represents a distinctive group in the community.  Alexander v. Louisiana, 405 U.S. 625, 628, 92 S. Ct. 1221, 1224 (1972); State v. Mann, 959 S.W.2d 503, 535 n.24 (Tenn. 1997).  However, as the State correctly asserts, the appellant has failed to present any evidence that the representation of African-Americans or minorities on the jury venire was unfair or unreasonable in relation to the percentage of African-Americans or minorities in Williamson County.  The appellant also failed to demonstrate that any under representation was due to the systematic exclusion of African-Americans or minorities in the jury selection process.  The appellant contends that "the selection of potential jurors in Williamson County is flawed in that potential jurors are selected from those persons having valid driver's licenses."  However, the Tennessee Supreme Court has previously approved the use of lists of registered drivers in selecting jurors.  Mann, 959 S.W.2d at 535.  Accordingly, we conclude that the appellant has failed to establish a prima facie violation of his right to have a jury selected from a representative cross-section of the community.  This issue is without merit.

D. Especially Aggravated Kidnapping

Finally, the appellant argues that his especially aggravated kidnapping conviction violates his right to due process because the kidnapping of Carter was incidental to the robbery of the Burger King restaurant. In support of his argument, the appellant cites State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991), in which our supreme court held that before a defendant can be convicted of a kidnapping charge, the trial court must determine

> whether the confinement, movement, or detention [was] essentially incidental to the accompanying felony and [was] not, therefore, sufficient to support a separate conviction for kidnapping, or whether it [was] significant enough, in and of itself, to warrant independent prosecution and [was], therefore, sufficient to support such conviction.

The Anthony court noted that "every robbery, by definition, involves some detention against the will of the victim, if only long enough to take goods or money from the person of the victim." Id. The Anthony court held that one method of determining whether the kidnapping was merely incidental to the robbery was to determine "whether the defendant's conduct 'substantially increased [the] risk of harm over and above that necessarily present in the crime of robbery itself.'" Id. (quoting State v. Rollins, 605 S.W.2d 828, 830 (Tenn. Crim. App. 1980)).

In State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), our supreme court revisited Anthony. The Dixon court held that

> [t]he Anthony decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of . . . robbery. Accordingly, any restraint in addition to that which is necessary to consummate . . . robbery may support a separate conviction for kidnapping.

Id. at 534-35. In Dixon, 957 S.W.2d at 535, the supreme court established a two prong test for determining whether a separate conviction for kidnapping violates due process. First, the trial court must determine whether the movement or confinement was beyond that necessary to commit the accompanying felony. Id. If so, the trial court must ascertain whether the additional movement or confinement (1) prevented the victim from summoning help; (2) lessened the appellant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Id.

We conclude that the detention of Carter was not merely incidental to the robbery of the Burger King restaurant. As Thompson forced Carter at gunpoint to collect the cash from the cash registers, the "dropboxes," and the safe, the appellant, armed with a pistol, bound Carter's co-workers. After the completion of the robbery, but prior to fleeing the scene, the appellant bound

Carter's wrist and ankles with duct tape. We conclude that the restraint of Carter was beyond that necessary to commit the robbery. See, e.g., State v. Rashe Moore, No. W2002-01195-CCA-R3-CD, 2003 WL 22888881, at *6 (Tenn. Crim. App. at Jackson, Dec. 3, 2003) (concluding that where the robberies occurred before the victims were moved and confined in the kitchen the convictions for especially aggravated kidnapping were not incidental to the accompanying felonies); State v. William Rhea Jackson, No. M2002-00762-CCA-R3-CD, 2003 WL 1563663, at *15 (Tenn. Crim. App. at Nashville, Mar. 27, 2003) (concluding that the binding of the victim after the commission of several crimes was beyond that necessary to consummate the other felonies).

We must now determine whether this additional restraint (1) prevented the victim from summoning help; (2) lessened the appellant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Dixon, 957 S.W.2d at 535. As noted, the appellant bound Carter's three co-workers upon entering the restaurant. After the completion of the robbery, the appellant bound Carter. We conclude that the binding of Carter hindered her ability to summon help which, in turn, lessened Thompson and the appellant's risk of detection. Moreover, the binding of the victims' wrists and ankles increased the risk of harm to the victims by rendering them helpless. Accordingly, we conclude that the appellant's conviction of especially aggravated kidnapping did not violate due process. This issue is without merit.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-12-